<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT</u>

I, Lavinia A. Quigley, being duly sworn, hereby depose and state as follows:

**A.      Introduction**

1.      I am a Police Officer with the Metropolitan Police Department (MPD), in Washington, D.C.  I have been a sworn officer with MPD since 1989.  My current rank is a Detective, second grade, and I have been assigned to the Major Narcotic Branch of the Criminal Investigations Division, or its predecessors, since August 1994.  Before this assignment, I worked with the MPD Rapid Deployment Unit for four years, specializing in vice, narcotics, and gun-recovery investigations.  Throughout my law enforcement career, I have attended classes, seminars, and special training sessions on the manufacture, packaging, use, and distribution of controlled substances, as well as the detection and apprehension of narcotics traffickers.

2.      I have served as an undercover officer buying illegal narcotics for six years and have made more than 1000 undercover purchases of illicit drugs of all kinds, including cocaine powder, crack cocaine, marijuana, and heroin.  Because of my experience, I am frequently called upon to assist in federal narcotics investigations by making undercover purchases of illegal drugs for such agencies as the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Bureau of Alcohol, Tobacco, and Firearms (ATF).  In the course of my police duties, I have interviewed hundreds of persons arrested in Washington, D.C., Maryland, and Virginia engaged in the illegal narcotics trade concerning their unlawful activities.  Further, I have spent many hundreds of hours engaged in secret surveillance of persons involved in illegal narcotic activity.  I also have participated in a number of long-term vice investigations that have resulted in prosecutions in federal and local courts in Washington, D.C.  As a result, I often have testified in federal and local courts.

I have also served as the affiant for more than 200 narcotics or firearm search warrants issued by judges of the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia.

3.      I make this affidavit in support of an application by the United States of America for the issuance of a criminal complaint and arrest warrant charging HABIBULLAH KARWAN with conspiracy, in violation of Title 18, United States Code, Section 371.  The facts set forth in this affidavit are based upon my own personal knowledge; knowledge obtained from other individuals, including law enforcement officers and industry representatives; my review or the review by other law enforcement officers of documents and of audio and video recordings of undercover law enforcement activities related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; consultations with technical experts both in law enforcement and industry; and information gained through my training and experience. Among the industry experts consulted during this investigation is Blazer Investigations whose private investigators have received extensive training from the manufacturers of trademarked goods, including Louis Vuitton, Gucci America, Inc, Burberry of England, Kate Spade, and Coach, in the recognition of counterfeit goods and who have experience assisting the FBI, United States Customs, and State and local police agencies in the detection of counterfeit goods.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a criminal complaint and arrest warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

   **B.     Background**

4.     In December 2004 the Spotsylvania County Sheriff's Office, in Spotsylvania, Virginia, executed search warrants on two locations suspected of trafficking in counterfeit products. Seized during execution of the search warrants was over $150,000 in retail value of counterfeit purses and wearing apparel. During the search of one of the locations, business and financial records were uncovered linking the illegal Virginia based activity to businesses located in the District of Columbia. Subsequent follow up investigation conducted by Spotsylvania County Sheriff's Detectives and Detectives from the Virginia Attorney General's Financial Crime Intelligence Center further identified one of the District of Columbia based operations as GIFTS UNLIMITED, located at 1345A 4th Street, NE, Washington, D.C. According to Virginia State Corporation Commission Records, the Directors of the company include HABIBULLAH KARWAN and Shamim Karwan, both of xxxx xxxxx xx. Alexandria Va, 22310.

5.     In January 2005 your affiant was contacted by Mr. Edward J. Doyle, Director of the Financial Crime Intelligence Center, Virginia Attorney General's Office, regarding the operation of GIFTS UNLIMITED. Mr. Edward J. Doyle has been the Director of the Financial Crime Intelligence Center for the Office of the Attorney General of Virginia since June 2002. Mr. Doyle is also a sworn Auxiliary Deputy Sheriff with the rank of Detective with the Spotsylvania County Sheriff's Office. Prior to his current employment, Mr. Doyle was employed by the U.S. Department of the Treasury's Financial Crime Enforcement Network (FinCEN), the U.S. Central Intelligence Agency, the Illinois Department of Law Enforcement's Division of Criminal Investigation, and the Illinois Legislative Investigating Commission. He has over 35 years of experience in organized

crime and drug related law enforcement and intelligence work; has participated in, conducted, and directly or indirectly supervised over 1,500 criminal investigations relating to money laundering; and has participated in over 15 counterfeit trademark cases.

6.    From January 2005 through the present, your affiant, along with Detective Doyle and other members of the Washington DC Metropolitan Police Department's Major Narcotics Unit, Major Case Squad, conducted an investigation relating to the sale of counterfeit products by GIFTS UNLIMITED in violation of Title 18, United States Code, Sections 371 and 2320. The investigation included interviews with two cooperating witnesses, surveillance of the premises, and undercover purchases from the business. Based upon this investigation, it is clear that HABIBULLAH KARWAN, as well as other managers and employees of GIFTS UNLIMITED at 1345A 4th Street, NE, Washington, D.C, are engaged in the commercial sale of counterfeit products to members of the public.

## C.    Relevant Code Sections

7.    Title 18, United States Code, Sections 371 and 2320 provide in pertinent part:

Section 371:
If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

Section 2320:
**(a)**    Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services shall, if an individual, be fined not more than $2,000,000 or imprisoned not more than 10 years, or both, and, if a person other than an individual, be fined not more than $5,000,000.

**(b)**    Upon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks, the United States may obtain an order for the destruction of such articles.

4

**... (e)**    For the purposes of this section –

**(1)**    the term "counterfeit mark" means –

**(A)**    a spurious mark

**(i)**    that is used in connection with trafficking in goods or services;

**(ii)**    that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and

**(iii)**    the use of which is likely to cause confusion, to cause mistake, or to deceive. . . .

**(2)**    the term "traffic" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to so transport, transfer, or dispose of. . . .

**D.**    **The Investigation**

**1.**    **Cooperating Witnesses**

8.    Your affiant and Detective Doyle interviewed two cooperating witnesses regarding the criminal activity conducted by GIFTS UNLIMITED, identified herein as CW-1 and CW-2. These interviews were conducted from December 2004 through May 2005. The two cooperating witnesses are common law husband and wife, and they operated a kiosk located in a mall in Spotsylvania, Virginia, selling counterfeit goods, some of which they purchased from GIFTS UNLIMITED, during the years 2003 and 2004.

9.    CW-1 has provided your affiant and Detective Doyle with information that has proven reliable on at least ten occasions and has never provided information to your affiant or anyone else associated with this investigation which has been found to be incorrect. As part of his/her cooperation with law enforcement, CW-1 has entered guilty pleas to two Virginia State misdemeanor offenses, trademark infringement and money laundering, and is awaiting sentencing. CW-1 has been involved in the distribution and sale of counterfeit products for the past two years and is familiar

5

with the packaging and recognition of counterfeit products, particularly counterfeit handbags, belts and scarves. CW-2 has proven reliable in the past on at least five occasions and also has never provided information to your affiant or anyone else associated with this investigation which has been found to be incorrect. As part of his/her cooperation with law enforcement, CW-2 has entered guilty pleas to two Virginia State misdemeanor offenses, trademark infringement and money laundering, and is awaiting sentencing. CW-2 is also familiar with the packaging and recognition of counterfeit products, particularly counterfeit handbags, belts and scarves.

10.    During interviews conducted by your affiant and Detective Doyle, CW-1 admitted purchasing counterfeit products including counterfeit handbags from GIFTS UNLIMITED. Often these transactions would be made in cash, by check and by credit card. CW-1 noted that on each occasion, the CW would receive a receipt for the purchase. CW-2 admitted to similar purchases of counterfeit products, including counterfeit purses, belts, wallets, key cases, and scarves from GIFTS UNLIMITED. Again, these transactions were often in cash, by check and by credit card and CW-2 would normally receive a receipt for each purchase.

## 2.    Undercover Purchases

11.    On April 25, 2005, your affiant and CW-1 proceeded to Gifts Unlimited located at 1345A 4th Street, NE, Washington, D.C., to purchase counterfeit handbags. Upon arrival at the location, your affiant and CW-1 were met outside the business by a female employee of the business, known to CW-1 as "Emma." Emma escorted your affiant and CW-1 into store where CW-1 met with HABIBULLA KARWAN, whom CW-1 identified as the owner of the business based upon CW-1's previous purchases from GIFTS UNLIMITED. CW-1 introduced your affiant to HABIBULLA KARWAN as CW-1's partner. Once inside the store, your affiant observed one

6

counterfeit Louis Vuitton purse, and other counterfeit Coach, Prada, and Kate Spade purses, containing counterfeit trademarks, for sale.

12.    HABIBULLA KARWAN said he was from Afghanistan where business enterprises are becoming very expensive.  HABIBULLA KARWAN said he purchased his home in Virginia in 1982 for $133,000, adding that was currently worth over $500,000.  HABIBULLA KARWAN said he had recently purchased a second house as an investment in Brandywine, Maryland, adding he wants to sell the residence in one year for a $100,000 profit.

13.    According to Prince George's County Maryland property records, HABIBULLA KARWAN and Shamim Karwan purchased a single family home on a 7,987 square foot lot located at xxxxxxxxxx xxxx, Brandywine Md, 20613, Assessor's Parcel Number 11-3488087 from NVR Inc. on May 10, 2005, for $356,050.

14.    CW-1 told HABIBULLA KARWAN that CW-1 and your affiant wanted to purchase some Louis Vuitton purses.  It was understood that the request to purchase such purses referred to counterfeit Louis Vuitton purses, rather than authentic purses, because that is what GIFTS UNLIMITED sells and that is what CW-1 had previously bought. HABIBULLA KARWAN replied that he was not selling Louis Vuitton until after Mother's Day because he considered it to be "too dangerous" (apart from the lone counterfeit Louis Vuitton purse which Your Affiant observed upon entering the store). HABIBULLA KARWAN said, "they catch you," implying that law enforcement efforts were active seizing counterfeit products prior to that date.

15.    HABIBULLA KARWAN said he had "a lot" (interpreted to mean counterfeit products) but he did not keep them there (interpreted to mean his business location) anymore. HABIBULLA KARWAN said he intended to bring his products back to the store several weeks after

Mother's Day. HABIBULLA KARWAN reiterated several times that after Mother's Day he could get Your Affiant anything she wanted and all she would have to do was call him in advance. HABIBULLA KARWAN said he lost $20,000 in product in December 2004 when representatives from Louis Vuitton, Rolex, Burberry and Tommy Hilfiger, along with three DC FBI agents and a representative from the Commerce Department, raided his store. He said he was lucky he was not in Virginia where he could be fined, adding in DC they just took his merchandise. HABIBULLA KARWAN noted that all too often people selling counterfeit Louis Vuitton are linked as supporters of Al Qu'eda. He said he did not want to be on television. HABIBULLA KARWAN told your affiant and CW-1 that they could order any brand from him and that he would supply them with what they want. HABIBULLA KARWAN also bemoaned that one of his customers who is a street vendor of counterfeit goods lost all his merchandise in a seizure by police and industry representatives. HABIBULLA KARWAN said the price for counterfeit Louis Vuitton was down but that Gucci was selling very good. He said he was trying to open another store with 7,000 square feet of space.

16.      According to Blazer Investigations, industry representatives enforced a civil seizure order on HABIBULLA KARWAN and his GIFTS UNLIMITED store located at 1345A 4th St., NE, Washington, D.C., in both June and December 2004, during which time counterfeit Louis Vuitton and Burberry goods were seized.

17.      "Emma" then assisted your affiant and CW-1 in selecting for purchase counterfeit handbags and wallets which your affiant stated were intended for resale at a "purse party." Emma also told your affiant that they had Gucci and Coach, meaning counterfeit Gucci and Coach, scarves for sale. Your affiant asked if HABIBULLA KARWAN had any "Burberry" purses. HABIBULLA

8

KARWAN displayed a counterfeit purse for your affiant but your affiant said she wanted the name on it. HABIBULLA KARWAN said he could affix a Burberry sticker (trademark logo) on it for your affiant. HABIBULLA KARWAN told your affiant that he could deliver Fendi and Louis Vuitton, meaning counterfeits, to your affiant the next day, but it would be dangerous.

18.     Your affiant purchased approximately ten (10) counterfeit handbags and two (2) counterfeit scarfs, each bearing counterfeit reproductions of federally registered trademarks of Coach, Prada, Gucci, Louis Vuitton, or Kate Spade. In exchange, your affiant paid HABIBULLA KARWAN $164. After the purchase, CW-1 asked your affiant if she had Vani bags at home. CW-1 then asked HABIBULLA KARWAN if he had Prada stickers. HABIBULLA KARWAN said, "OK, I get some for you," at which time HABIBULLA KARWAN exited the store. Det. Doyle, who was conducting a surveillance on the target location, observed a balding, heavy set, white male, wearing a blue shirt and blue jeans, subsequently identified as HABIBULLA KARWAN, exit the entrance of GIFTS UNLIMITED, 1345A 4th St., NE, Washington, D.C. HABIBULLA KARWAN proceeded to the driver's side door of a 2003 Toyota Four Runner bearing Virginia license plates JGG 4832 and entered the vehicle. He remained in the vehicle for about 45 seconds and appeared to reach under the front seat. He then returned to the store, carrying something in his hand. Upon re-entering the store, HABIBULLA KARWAN gave CW-1 a bag containing ten (10) Prada trademark logos or "stickers" which he said cost $10. Your Affiant paid HABIBULLA KARWAN for the logos.

19.     All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those

goods on the principal register in the United States Patent and Trademark Office and are in use, pursuant to Title 18, United States Code, Section 2320.

20.     On November 2, 2005, your affiant proceeded to GIFTS UNLIMITED, located at 1345A 4th Street, NE, Washington, D.C., to verify that HABIBULLAH KARWAN and GIFTS UNLIMITED were still trafficking in counterfeit goods in that location.  Once inside GIFTS UNLIMITED, your affiant met HABIBULLAH KARWAN and discussed with him purchasing counterfeit handbags.  Your affiant asked HABIBULLAH KARWAN whether he had any Louis Vuitton pocket books, and HABIBULLAH KARWAN replied that he did.  HABIBULLAH KARWAN displayed to your affiant Chloe and Gucci handbags which appeared to your affiant to bear counterfeit marks.  Your affiant told HABIBULLAH KARWAN that your affiant would purchase four of the Gucci bags. HABIBULLAH KARWAN then went to his vehicle, the gold 2003 Toyota Four Runner, Virginia license plate number JGG4832, Vehicle Identification Number JTEBU14R030018025, and retrieved numerous Louis Vuitton handbags bearing what appeared to be counterfeit trademarks.  HABIBULLAH KARWAN displayed the Louis Vuitton bags to your affiant who selected ten for purchase.  Your affiant informed HABIBULLAH KARWAN that your affiant wanted to purchase more bags the next Thursday for a "purse party," where counterfeit goods are sold, to be held the following week.  HABIBULLAH KARWAN informed your affiant that he keeps the Louis Vuitton hanbags in his vehicle.  In total, your affiant purchased ten Louis Vuitton handbags; two Coach handbags; one Prada handbag; five Louis Vuitton scarfs and hats; four Gucci handbags; three Fendi wallets; four Louis Vuitton wallets; and one Chloe handbag.  Your affiant paid HABIBULLAH KARWAN $482 in MPD funds for the items and received a receipt from HABIBULLAH KARWAN.  All items purchased during this undercover visit were later inspected

by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, pursuant to Title 18, United States Code, Section 2320.

### E.    Conclusion

21.    Based on the information set forth above, the undersigned affiant submits that there is probable cause to believe that HABIBULLA KARWAN conspired with the person known to your affiant as "Emma" and others to traffic in counterfeit goods, in violation of Title 18, United States Code, Sections 371 and 2320.


_____
Detective Lavinia A. Quigley
Metropolitan Police Department


Sworn to before me and subscribed in my presence this _____ day of November 2005.


_____
United States Magistrate Judge
District of Columbia

11